# D. Statement of Claims
Claim One: ADA Failure to Accommodate, continued

1.      Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

2.      At all times relevant to this action, Plaintiff Janine L. Gentile was a resident of and domiciled in the State of Colorado.

3.      At all relevant times, Defendant Colorado State University was an institute of higher education with a principal office address of 555 S. Howes St., Fort Collins, CO 80521.

4.      Colorado State University employs more than 500 employees within a 75-mile radius of its main office.

5.      Plaintiff is an individual with a qualified disability under the ADA.

6.      Plaintiff is an individual with a qualified disability under the Colorado Anti-Discrimination Act.

7.      Ms. Gentile was employed full time by Colorado State University for over 19 years, from May 2000 to October 11, 2019.

8.      Ms. Gentile worked for at least 1,250 hours in each 2017 and 2018, and for the 12 months leading up to the action.

9.      Colorado State University is a covered employer under the ADA.

10.      Colorado State University is a covered employer under the Colorado Anti-Discrimination Act.

11.      Colorado State University is a covered employer under the FMLA.

12.     At all times, Ms. Gentile attempted to take as little protected medical leave as possible in order to recover.

13.   As of October 11, 2019, CSU had maintained over 500 employees on its payroll for each working day during each of 20 or more calendar workweeks in 2019 and 2018.

14.     This Court has proper subject matter jurisdiction because Plaintiff's ADA and FMLA claims arise under laws of the United States.

15.     Venue is proper in this Court as all Defendants reside in this district, and all the events or omissions giving rise to the claims herein occurred in this district.

16.     Ms. Gentile submitted an inquiry with the EEOC about the claims herein on 01/28/2020.

17.     Ms. Gentile's Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") is dated February 05, 2020.

18.     The Charge of Discrimination included allegations of disability discrimination and retaliation.

19.     The EEOC issued Ms. Gentile a Notice of Right to Sue on September 23, 2020.

20.     Ms. Gentile has filed this action within 90 days of the date the EEOC's Notice of Suit Rights was issued.

21.     In July 2015, Plaintiff Gentile applied for ADA disability status with CSU for major depression and anxiety.

22.     10/15/2015, three months after application, Colorado State University designated Ms. Gentile as a person with a disability, as defined by the ADA, eligible to receive accommodations.

23.    Colorado State University ("CSU") is an institution of higher education that provides education, research, and services.

24.    CSU is comprised of several Colleges and each College is comprised of departments and each department may be comprised of supporting units.

25.    Ms. Gentile worked within the CSU College of Veterinary Medicine and Biomedical Sciences ("CVMBS") in the CVMBS College Office Department's Information Technology Services ("IT") unit.

26.    The CSU Veterinary Teaching Hospital ("VTH") is a revenue producing department within CVMBS that provides veterinary services to the general public.

27.    CSU Veterinary Diagnostic Laboratories ("VDL") is a revenue producing department within CVMBS that provides laboratory services to VTH, the general public, and government agencies.

28.    CSU employs project managers, Information Technology managers, software developers, database administrators, faculty veterinarians, veterinary technicians, administrative support staff, faculty, researchers, software support staff, and other positions to provide its services.

29.    Ms. Gentile's employee classification at CSU was Administrative Professional for her entire employment history.

30.    Ms. Gentile began her employment as an entry-level software developer in 2000.

31.    Ms. Gentile completed her M.S. Computer Information Systems degree in 2000.

32.    In 2004, Ms. Gentile's employer promoted her to manage software developers.

33.    In 2014, Ms. Gentile moved into a Project Manager position within the same unit and met the required qualifications for the position.

34.    The position of Project Manager was a full-time position.

35.    At all times relevant to this action, Ms. Gentile held the Project Management Professional (PMP)® Credential ("PMP") with the Project Management Institute.

36.    The PMP is the industry-recognized certification for Project Managers and is an internationally recognized professional designation.

37.    The CVMBS Project Manager responsibilities include but are not limited to:

a.    The Project Manager is responsible for planning and successfully implementing IT projects involving systems and system upgrades/improvements using contemporary project management strategies and methodologies.

b.    The IT projects may range from in-house software development to implementation of vendor-supplied systems.

c.    This position tracks requests that may become projects and coordinates the request disposition with IT Services managers.

d.    The Project Manager position also provides guidance on best practices and tools than can be applied more broadly in CVMBS, beyond IT Services projects, and may lead such projects as needs arise.

e.    Communicate in a timely, constructive manner at appropriate organizational levels, the project statuses and challenges.

f.    The Project Manager's principal decision making includes:

i.    Determine the stakeholders (e.g., internal and external team members, upper management, vendors, users) and any information sources needed to produce, maintain and complete a workable plan

    ii.  Determine the types and frequency of communications necessary to optimally keep stakeholders coordinated as project progresses.

    iii.  Determines the appropriate level of work breakdown detail and timeline points, to define the project and track progress.

    iv.  Decides when escalation of issues is required.

    v.  Position is relied upon to recommend optimal paths of work to achieve project goals.

38.    During her employment, Ms. Gentile successfully led several projects for her employer in her role as Project Manager and in her previous role as manager of software development.

39.    Ms. Gentile was chosen to be the Project Manager for CVMBS' "StringSoft" project.

40.    The StringSoft project would replace VTH's electronic medical record system, billing system, laboratory information systems, paper forms, and scheduling system.

41.    StringSoft was considered by many CVMBS managers and administrators to be one the largest software implementation projects that CVMBS had ever undertaken.

42.    At all times relevant to this action, Ms. Gentile's supervisor was George Joseph Strecker ("J. Strecker").

43.    At all times relevant to this action, J. Strecker's job position was split between Manager of Research IT and Manager of IT Project Management.

44.    At all times relevant to this action, J. Strecker did not hold a PMP credential.

45.    As Ms. Gentile's supervisor, J. Strecker had the authority to:

    a.  direct her work;

    b.  evaluate her work performance;

    c.  make determinations regarding reasonable accommodations, sick leave, and annual (personal) leave; and,

    d.  recommend termination of employment

46.    At all times relevant to this action, Jennifer Mayhew ("J. Mayhew") was Assistant Director for Complaints and Disabilities with CSU's Office of Equal Opportunity ("OEO").

    a.  Ms. Mayhew handled ADA disability processes and guidance for employees.

    b.  Ms. Mayhew handled employee complaints against CSU.

47.    At all times relevant to this action, Kacie Reed ("K. Reed") was the Information Technology Director.

48.    At all times relevant to this action, Kacie Reed ("K. Reed") was J. Strecker's supervisor.

49.    K. Reed had the authority to:

    a.  direct J. Strecker's work;

    b.  make determinations regarding reasonable accommodations, sick leave, and annual (personal) leave for any IT staff;

    c.  recommend termination of employment for any IT staff;

    d.  make decisions about IT's budget and operations

50.    At all times relevant to this action, Christy Conrad ("C. Conrad") was the Human Resources Director for CVMBS.

51.    At all times relevant to this action, C. Conrad provided guidance and assistance to J. Gentile, J. Strecker, and K. Reed in Ms. Gentile's ADA reasonable accommodation process.

52.     At all times relevant to this action, C. Conrad had the authority to provide guidance and assistance to CVMBS staff on human resource processes, questions and concerns.

53.     On 10/30/2015, Plaintiff met with J. Strecker and C. Conrad to discuss an ADA reasonable accommodation for a privacy divider for Ms. Gentile's cube that would meet Kacie Reed's requirement to make sure that other IT staff did not think Ms. Gentile was being provided with something that they were not.

54.     Three months later, on 2/01/2016, Jennifer Mayhew ("J. Mayhew") of CSU's Office of Equal Opportunity ("OEO") emailed Ms. Gentile stating that she would draft a document of the discussed reasonable accommodations to be reviewed and then formalized.

    a.  Accommodations were implemented.

55.     Symptoms of depression include but are not limited to:

    a.  Feelings of sadness, tearfulness, emptiness or hopelessness

    b.  Angry outbursts, irritability or frustration, even over small matters

    c.  Loss of interest or pleasure in most or all normal activities, such as hobbies or sports

    d.  Sleep disturbances, including insomnia or sleeping too much

    e.  Tiredness and lack of energy, so even small tasks take extra effort

    f.  Reduced appetite and weight loss or increased cravings for food and weight gain

    g.  Anxiety, agitation or restlessness

    h.  Slowed thinking, speaking or body movements

    i.  Feelings of worthlessness or guilt, fixating on past failures or self-blame

    j.  Trouble thinking, concentrating, making decisions and remembering things

    k.  Frequent or recurrent thoughts of death, suicidal thoughts, suicide attempts or suicide

    l.  Unexplained physical problems, such as back pain or headaches

56.    Symptoms of anxiety include but are not limited to:

    a.  Feeling nervous, restless or tense

    b.  Having a sense of impending danger, panic or doom

    c.  Having an increased heart rate

    d.  Breathing rapidly (hyperventilation)

    e.  Sweating

    f.  Trembling

    g.  Feeling weak or tired

    h.  Trouble concentrating or thinking about anything other than the present worry

    i.  Having trouble sleeping

    j.  Experiencing gastrointestinal (GI) problems

    k.  Having difficulty controlling worry

    l.  Having the urge to avoid things that trigger anxiety

57.    On 09/30/2018, Ms. Gentile had a conversation with J. Strecker and explained that she was experiencing symptoms of her ADA covered disability that were impacting her ability to communicate project statuses and challenges in a constructive manner, which was an essential part of her job.

58.    On 10/8/2018 Plaintiff met with Jennifer Mayhew of CSU OEO to discuss how symptoms of her disability conditions were impacting her ability to perform in her job and to seek guidance and options.

a. Ms. Gentile told J. Mayhew that she was experiencing increased symptoms of her ADA covered disability, such as trouble concentrating, fatigue, trouble staying on task, and trouble thinking on her feet during conversations.

b. Ms. Gentile told J. Mayhew that symptoms of her disability were impacting her ability to successfully perform some job functions.

c. Ms. Gentile told J. Mayhew that she was concerned she might lose her job as result of the concerns herein.

d. Ms. Gentile cried while speaking with J. Mayhew about the concerns herein.

e. Ms. Gentile told J. Mayhew provided examples of how her disability symptoms were exacerbated by the concerns herein, perpetuating the difficulty in successfully performing duties of her job.

f. Ms. Gentile asked J. Mayhew about the process for moving into a different position at CSU in case she could not continue to perform as Project Manager at CVMBS.

g. J. Mayhew explained to Ms. Gentile that a disability accommodation is meant to put a person in a position to perform the essential functions of the job; a level playing field.

h. J. Mayhew told Ms. Gentile that all possible accommodations would be tried first and then if performance was not adequate, they could then look at other job options across the University.

i. J. Mayhew suggested that Ms. Gentile investigate and try other ADA reasonable accommodations.

     j.    J. Mayhew said that a work from home accommodation could be a possible option for reasonable accommodation.

     k.    J. Mayhew suggested that Ms. Gentile visit the askjan.org website for examples of disability accommodations.

59.     According to the askjan.org website, under 'Our Mission', "The Job Accommodation Network (JAN) is the leading source of free, expert, and confidential guidance on workplace accommodations and disability employment issues."

60.     On 11/15/2018, Plaintiff emailed J. Mayhew exchanged emails about ideas for a work from home accommodation.

61.     On 11/26/2018, Ms. Gentile emailed J. Mayhew a formal request for a work from home accommodation, asking for a fixed part-time work from home schedule of 4 days per week starting at 2pm each day, and to work from home as an accommodation on an ad hoc basis on days that she is unable to come to the office due to her disability symptoms but is able to work.

62.     About 2 months after the initial request for reasonable accommodation, on 1/23/2019, J. Mayhew emailed Ms. Gentile to schedule a meeting to begin the interactive process with her for the accommodation.

63.     On 2/1/19, Ms. Gentile had a phone call with J. Mayhew to begin the interactive process.

     a.    Ms. Mayhew said she talked to J. Strecker about my request to work from home four days/week starting at 2pm.

     b.    Ms. Mayhew said J. Strecker had concerns about interference with meetings but indicated no concerns with my work ethic.

    c.   She said J. Strecker suggested two days/week from 2-5PM with flexibility for ad hoc use.

    d.   She said J. Strecker would still need to have it approved by his supervisor, K. Reed, but that he thought she would be amenable.

    e.   I agreed to J. Strecker's revision to my original accommodation request.

64.    About another month later without action by CSU on my request, I sent an email to J. Mayhew on 3/04/2019 asking about progress on my request for reasonable accommodation.

65.    J. Mayhew responded to my email on 3/06/2019 stating that:

    a.   she was delayed in reaching back out to J. Strecker after her 2/01/2019 phone call with Ms. Gentile;

    b.   she had now conveyed to J. Strecker what she and Ms. Gentile discussed on 2/01/2019.

66.    On 3/29/2019, I contacted J. Mayhew to let her know that I had just found out that I was going to be laid off in the August-September timeframe..

    a.   Reasonable accommodation had not yet been provided when I contacted J. Mayhew on 3/29/2019.

67.    About 5 months after initiating my request for reasonable accommodation, and about 2 ½ months after my only involvement in the interactive process thus far, and about 2 weeks after finding out I would be laid off, on 4/12/2019, I met with Ms. Mayhew to discuss J. Strecker's response to the accommodation request.

    a.   Ms. Mayhew said that J. Strecker responded as follows regarding my accommodation request:

    b.   J. Strecker's supervisor, K. Reed, thought that working from home two afternoons of 3 hours each was 'too much'.

    c.   K. Reed proposed that I work from home each Monday from 11am-5pm, which would still give me six hours per week.

    d.   I could notify J. Strecker to work from home on an as needed basis.

    e.   J. Mayhew said that there would be an 8-week trial period after which we would follow up.

    f.   I agreed with the proposed accommodation.

68.    On 4/16/2019, J. Mayhew emailed Ms. Gentile with revisions to the accommodation terms that had been discussed on 4/12/2019.

    a.   Ms. Mayhew said that she followed up with J. Strecker after she and I met on 4/12/2019 and he proposed the following:

    b.   I could start the work from home on Mondays 11-5 beginning April 22, 2019.

    c.   The trial period would run through the end of June.

    d.   From July into August, a definitive 11am-5pm on Mondays may not be an option.

    e.   August 5th would not be a work from home opportunity.

    f.   Ms. Mayhew said that we could schedule an interactive process meeting close to the end of June to discuss what accommodations might look like for July and August.

    g.   Ms. Mayhew said if this is was acceptable, she would work on getting draft accommodations together.

    h.   Ms. Gentile agreed to the proposed accommodation via email on 4/16/2019.

69.     No follow up occurred after the trial period and no interactive process meeting occurred to discuss accommodations for July and August.

70.     On multiple occasions prior to Ms. Gentile's request for reasonable accommodation, Ms. Gentile talked to J. Strecker in detail about how she was struggling to perform some of her job duties due symptoms of her ADA covered disability.

71.     On multiple occasions after Ms. Gentile's request for reasonable accommodation, Ms. Gentile talked J. Strecker in detail about how she was struggling to some of her perform her job duties due to symptoms of her ADA covered disability.

72.     In Fall 2018, Ms. Gentile had multiple conversations with C. Conrad to discuss how symptoms of her disability conditions were impacting her ability to perform in her job and to seek guidance and options.

a.  Ms. Gentile told C. Conrad that she was experiencing symptoms of her ADA covered disability, such as trouble concentrating, fatigue, trouble staying on task, and trouble thinking on her feet during conversations, that were impacting her ability to successfully perform essential job functions.

b.  Ms. Gentile shared with C. Conrad that she sometimes took a break to sleep in her car in the parking lot due to uncontrollable fatigue during the workday and it took too much time to go home for the break.

c.  Ms. Gentile cried while speaking with C. Conrad about the concerns herein.

d.  Ms. Gentile provided examples to C. Conrad of how her disability symptoms were exacerbated by the concerns herein and thus they perpetuated her difficulty in successfully performing duties of her job.

e. Ms. Gentile and C. Conrad talked about options such as taking extended leave or looking at other job positions.

73. On 2/11/19, Plaintiff had a phone call with Jackie Swaro, CSU Human Resources Benefits Administrator Team Lead ("J. Swaro") to ask questions about extended leave and short-term disability processes.

a. Plaintiff told J. Swaro that she was finding it increasingly difficult to perform her job due to her disability symptoms.

b. Plaintiff asked J. Swaro questions about the leave and short-term disability processes.

74. On 2/19/2019, Plaintiff told her supervisor, J. Strecker, that she was considering taking extended time off due to her disability symptoms and having difficulty performing in her job due to those symptoms.

a. Ms. Gentile told J. Strecker that she could see losing her job right now because she was having difficulty functioning at work and successfully performing essential functions of her job due to her disability.

b. Ms. Gentile told J. Strecker that she often had to work extended hours and stay up late to get her work done in order to make up for sick days as well as her inability to focus during the workday, both due to her disability.

c. Ms. Gentile told J. Strecker that it was a vicious cycle of working extended hours and staying up late to get her work done, which caused stress and exhaustion, causing her to miss more work and get behind on tasks, and having to work extended hours to make up for the work, and that the vicious cycle impacted her ability to successfully perform in her job.

    d.   Ms. Gentile provided J. Strecker with other examples of how her disability symptoms were exacerbated by the concerns herein and thus perpetuated her difficulty in successfully performing duties of her job.

    e.   Ms. Gentile told J. Strecker of the possibility that, because of her disability symptoms worsening, she might need to take extended leave.

75.    A State of Colorado Flexplace Agreement is the document used by Ms. Gentile's employer for employees to request and get approval to work from home.

76.    A State of Colorado Flexplace Agreement describes Flexplace as an alternate method of meeting the needs of the Employer and Employee by allowing the employee to work away from the regular office.

77.    At all times relevant to this action, a State of Colorado Flexplace Agreement was implemented via a form that was signed by the employee, the employee's supervisor, and the appointing authority.

78.    For many years prior and at all times relevant to this action, several other IT employees and CVMBS employees exercised use of the State of Colorado Flexplace Participation Agreement to work from home.

79.    At all times relevant to this action, several CVMBS staff who, in addition to Ms. Gentile, were critical to the StringSoft project, exercised use of the State of Colorado Flexplace Participation Agreement to work from home.

80.    In Ms. Gentile's previous job role in CVMBS, she implemented Flexplace Agreements for her employees and found the Flexplace process to be complete in less than a week.

81.     At all times relevant to this action, it was a regular occurrence for CVMBS staff and vendors to attend StringSoft project meetings and other work meetings remotely.

82.     At all times relevant to this action, adequate technology was available to host and attend meetings remotely.

83.     Ms. Gentile had worked from home successfully and productively many times prior to the 11/26/2018 request for reasonable accommodation.

84.     Providing a Flexplace work from home accommodation to Ms. Gentile was not unreasonable and did not pose an undue burden on CSU.

85.     The EEOC's guidance document," Enforcement Guidance on Reasonable Accommodation and Undue Hardship under the ADA", states the following: "An employer should respond expeditiously to a request for reasonable accommodation. If the employer and the individual with a disability need to engage in an interactive process, this too should proceed as quickly as possible. Similarly, the employer should act promptly to provide the reasonable accommodation. Unnecessary delays can result in a violation of the ADA."

86.     CSU did not make a good faith effort to provide reasonable accommodation to the Plaintiff.

87.     Despite telling OEO, CVMBS HR, CSU HR, and my supervisor on multiple occasions from September 2018 to April 2019 that I was having difficulty performing essential functions of my job due to symptoms of my ADA covered disability, describing symptoms that could be alleviated with the requested reasonable accommodation, and sharing the severity of the problem, it still took about five months for the request for the reasonable accommodation to be implemented.

88.     From November 26, 2018 to 4/21/2019, CSU discriminated against Ms. Gentile by failing to accommodate Ms. Gentile's request for reasonable accommodation.

89.     CSU took about five months to implement a request for reasonable accommodation, where this type of Flexplace Agreement had historically been implemented by her employer in less than a week for employees not covered under ADA.

90.     CSU discriminated against Ms. Gentile by not responding expeditiously to Ms. Gentile's request for reasonable accommodation.

91.     CSU discriminated against Ms. Gentile by not engaging in the interactive process as quickly as possible.

92.     CSU discriminated against Ms. Gentile by not acting promptly to provide the reasonable accommodation.

93.     CSU discriminated against Ms. Gentile by creating unnecessary delays in the process for reasonable accommodation.

94.     CSU discriminated against Ms. Gentile by avoiding the reasonable accommodation process.

95.     At all times relevant to this action, J. Strecker's office was an estimated 10 feet from K. Reed's office.

96.     At the time of her 11/26/2018 request for reasonable accommodation, Ms. Gentile was qualified for her position and successfully performed the essential functions of her job.

97.     Ms. Gentile could have continued to perform the essential functions of her job with reasonable accommodation.

98.    When working from home for several hours a week, Ms. Gentile experienced improved performance, productivity, stress levels, and overall health that allowed her to successfully perform the essential functions of her job, including but not limited to:

    a.   less distractions and interruptions improved her focus and concentration and allowed her to take tasks to completion more quickly;

    b.   the ability to have uninterrupted work time to dedicate larger contiguous chunks of time helped her to plan and prioritize, and to finish complex, involved work items;

    c.   the ability to have periods of mental rest without interruption or stimulus in order to refocus and reorient her work helped to reduce overall anxiety and increase productivity;

    d.   decreased stress and increased positivity from a better work-life balance since she was able to be in her home sometimes when her daughter got home from school;

    e.   the ability to take medications more consistently at home because they required food and she often didn't have time to eat when she was at work.

99.    After the reasonable accommodation was implemented, Ms. Gentile had a regular weekly meeting with J. Strecker on 4/30/2019, where he complimented her for holding a superb meeting that day and said things in the project were going as well as they could.

100.    After the reasonable accommodation was implemented, Ms. Gentile had a regular weekly meeting with J. Strecker on 5/14/2019, where he said, "Thanks for being aware of all these (StringSoft project) things", "It's a lot going on", said he was seeing her doing great work, and said, "Thank you. This is working, as crazy as the whole thing is, it's working."

101.     On 6/18/2019, about 8 weeks after Ms. Gentile's accommodation was implemented, J. Strecker told Ms. Gentile that she had a good work ethic and he sincerely appreciated her ability to generate momentum and progress in keeping the StringSoft project moving forward and that this was admirable with the distraction of the layoff.

102.     In Fall 2018, Ms. Gentile began therapy for her covered disability conditions with a licensed counselor. The content of the sessions included but was not limited to:

    a.  Ms. Gentile sharing that she lost confidence and self-esteem because of being negatively perceived at work because of her disability.

    b.   Ms. Gentile sharing that she lost confidence and self-esteem because of being negatively treated at work because of her disability.

    c.  Ms. Gentile sharing fears of losing her job because of her disability.

    d.  Ms. Gentile sharing that her work situation was making symptoms of her ADA covered disability much worse and causing additional symptoms that she had not been experiencing prior to the CSU actions herein.

103.     At CSU CVMBS, an Administrative Professional employee performance evaluation score of 3 means 'Meeting All Expectations' and a score of 4 means 'Exceeding Most/several Expectations (emerging leader)'.

104.     On 3/1/2019 Plaintiff and J. Strecker met for her annual performance evaluation.

    a.  J. Strecker prefaced the conversation by telling Ms. Gentile that this was not a corrective action.

    b.  Ms. Gentile's performance evaluation score decreased substantially from the prior year; the score decreased from 3.78 to 2.94.

c.  Ms. Gentile's performance evaluation score of 2.94 fell below 'Meeting All Expectations'.

d.  J. Strecker's written evaluation feedback cited essential functions of the job that were not being met and stated that she would achieve major success and demonstrate her full range of capabilities if she addressed those.

e.  J. Strecker's written evaluation feedback said that Ms. Gentile was encouraged to actively seek out any resources.

105.  About 3 ½ months prior to Ms. Gentile's 3/01/2019 poor performance evaluation, Ms. Gentile requested the reasonable accommodation to put her in a position to successfully perform the essential functions of her job, and the accommodation had still not been implemented at the time of her performance evaluation.

106.  After Ms. Gentile's 3/01/2019 poor performance evaluation, it still took almost 2 months before the accommodation was implemented, despite J. Strecker's evaluation feedback encouraging Ms. Gentile to seek resources.

107.  On 3/29/2019, Plaintiff was called to a meeting with Jon Stocking ("J. Stocking"), Senior Director of CVMBS Operations, K. Reed, and J. Strecker.

a.  Ms. Gentile was told that she would likely be laid off.

b.  J. Stocking estimated that Ms. Gentile's employment would end "Once StringSoft is implemented in August timeframe, so around September."

c.  J. Stocking said that he had talked to Mark Stetter, Dean of CVMBS, and Thom Hadley, CVMBS Executive Director of Operations, and they agreed that this is the way they have to go.

d.  J. Stocking said that the process of formalizing the layoff included acceptance by Tony Frank, President of CSU at the time of the 3/29/2019 meeting, and then sending it through General Counsel and CSU.

e.  J. Stocking told Ms. Gentile that there were two entry-level software developer positions coming up elsewhere in the University, in Information Systems ("IS").

f.  J. Stocking said that the salary of the IS software developer positions would be lower than Ms. Gentile's current salary and suggested asking IS if they would be willing to combine the two positions into one position at a higher salary.

g.  Ms. Gentile responded that she did not think she was currently qualified for the IS software developer positions because she had not done computer programming in about 11 years.

108.    Ms. Gentile was told that her employment with CSU would end approximately five weeks after she told J. Strecker that she might take extended leave to alleviate her disability symptoms.

109.    Ms. Gentile was told that her employment would end just 28 days after she received J. Swaro's email saying that she was approved to use up to 14 days per month of unscheduled leave under FMLA.

110.    CSU job postings for the IS software developer positions showed their salaries at less than 60% of Ms. Gentile's salary at that time, yet on 3/29/2019 her employer suggested she consider these positions.

111.    The IS software developer positions suggested to Ms. Gentile by her employer on 3/29/2019 would have been a demotion for Ms. Gentile because she was hired into an entry-

level software development position at CSU 19 years prior and had since been promoted to management positions, and also because the salary was substantially lower.

112.   Ms. Gentile requested reasonable accommodation on 11/26/2018 and it took about five months for implementation.

113.   Ms. Gentile's request for reasonable accommodation was implemented after being informed of the layoff.

114.   The promised follow-ups regarding the accommodation did not occur after the accommodation was implemented.

115.   On 6/18/2019, in a meeting with K. Reed and J. Strecker, K. Reed confirmed to Ms. Gentile that her employment with CSU would end after StringSoft post-Go Live activities.

   a.   K. Reed told Ms. Gentile that she would receive a formal letter in a couple weeks from CVMBS HR.

   b.   She said that I should mention any reasons to stay past August in my response to the letter.

116.   On 8/22/2019, Dr. Mark Stetter notified Ms. Gentile via certified mail that he would be recommending termination of my employment to President McConnell, CSU President at the time of his notice, with an effective date of October 11, 2019.

117.   On 9/10/2019, Dr. Mark Stetter emailed Ms. Gentile that her employment with CSU would be terminated effective October 11, 2019.

118.   As a direct result of Defendant's actions, Plaintiff was diagnosed with PTSD [F43.10] on 11/06/2019.

119.    On 2/25/2019, J. Swaro emailed Ms. Gentile saying that she received the copy of medical certification for FML from Ms. Gentile's health care provider.

120.    On 03/01/2019 Plaintiff received an email from Jackie Swaro, CSU HR Benefits Administrator Team Lead, stating that FML was approved retroactively beginning Feb 21, 2019.

      a.  The FMLA Designation Notice approved Ms. Gentile's FML for estimated frequency of flare-ups of 1 time per month, up to 14 days per episode, for up to 480 hours for the year.

      b.  The FMLA Designation Notice approved leave for symptoms related to Ms. Gentile's ADA covered disability.

121.    By failing to accommodate Ms. Gentile, CSU altered the terms and conditions of her employment.

122.    As a result of CSU's failure to accommodate Ms. Gentile, Ms. Gentile received a poor performance evaluation.

123.    CSU performance evaluations remain in CSU employment files and potentially impact future salary and employment opportunities.

124.    As a result of CSU's failure to accommodate Ms. Gentile, CSU terminated Ms. Gentile's employment.

125.    CSU's conduct described herein violated the antidiscrimination laws of the United States and constitutes prohibited discriminatory practices thereunder.

126.    Defendant's conduct and actions described herein was intentional, willful and/or done with malice and/or reckless disregard of Ms. Gentile's protected rights under federal law.

127.    As a direct result of Defendant's actions, Ms. Gentile has suffered significant injuries, damages, and losses to be determined at trial.

# D. Statement of Claims
Claim Two: ADA Retaliation, continued

128.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully

set forth herein.

129.    The ADA prohibits retaliation.

130.    Ms. Gentile's depression and anxiety were qualifying disability under the ADA.

131.    To prove retaliation, the plaintiff must show that: (1) she engaged in

protected activity, (2) a reasonable employee would have found the challenged action

materially adverse, and (3) there is a causal connection between the protected activity

and the material adverse action.

132.    Ms. Gentile engaged in protected activity including but not limited to

requesting accommodation for her disability.

133.    On 2/11/19, Plaintiff spoke with J. Swaro to ask questions about the short-term

disability leave processes.

134.    On 2/19/2019, Plaintiff told her supervisor, J. Strecker, that she was considering

taking short-term disability leave at some point due to symptoms of her ADA disability and

having difficulty performing in her job due to those symptoms.

135.    Ms. Gentile told J. Strecker that she had a conversation with Jackie Swaro about

the short-term disability process.

136.    Ms. Gentle said it wasn't something she really wanted to do but given that she kept missing work and going through the vicious cycle she wasn't sure.

137.    Ms. Gentile said that she was dedicated to her job.

138.    Ms. Gentile asked if she could work with J. Strecker to get him up to speed on her StringSoft project tasks in case she needed to take leave.

139.    Ms. Gentile mentioned a church sermon she attended that validated the stigma of depression for her, such as being at work and you're not supposed to talk about it.

140.    J. Strecker replied, "Like it's moral weakness."

141.    I agreed and said it was systemic and that I had thought about writing a letter to CSU to take a look at that.

142.    Ms. Gentile continued to tell J. Strecker that J. Mayhew opined for Ms. Gentile to not tell her project team about her disability - and that when you have the person that's responsible for disability at CSU acknowledging that people could perceive it like you're just trying to make excuses (for your disability), and you're in a vulnerable position, then you just do what people tell you to do.

143.    Ms. Gentile said she wondered how disability leave would look at your job, that you show you can't perform, that you can't take it.

144.    J. Strecker replied, "On some level, it's already happened, right?"

145.    CSU notified Ms. Gentile of intent to terminate her employment approximately one month after her FMLA Designation Notice approving episodes of 14 days per month of unscheduled leave for symptoms of her ADA covered disability.

146.    Ms. Gentile's salary was paid from CVBMS' budget.

147.     Defendant discriminated against Ms. Gentile based on disability and protected medical leave needed for her disability, by attempting to move her into a different College.

148.     In a meeting with K. Reed and J. Strecker on 6/18/2019, K. Reed encouraged Ms. Gentile to apply for one of four software developer positions that would be opening soon at Academic Computing and Network Services ("ACNS").

a. K. Reed said that she spoke with the Brandon Bernier ("B. Bernier"), the Director of ACNS, on Ms. Gentile's behalf for the software developer positions, but that she did not use her name.

b. K. Reed said that she told B. Bernier that I was very intelligent, pick up on things very quickly, and have a very good work ethic.

c. K. Reed that she did not go into great detail about my performance but that ACNS might ask to see my performance evaluation.

d. K. Reed said that she would not speak with B. Bernier about my disability accommodations.

e. K. Reed said the ACNS software developer positions had not been posted but she guessed they would pay $70,000-80,000.

149.     The ACSN software developer position that K. Reed encouraged Ms. Gentile to apply for would have been a demotion for Ms. Gentile because she was hired into a software development position at CSU 19 years prior and had since been promoted into management positions, and also because the salary was about 69% of Ms. Gentile's current salary as Project Manager.

150.     At the time of the 6/18/2019 meeting with Ms. Gentile, K. Reed had knowledge of a project management position elsewhere at CSU, with a proposed annual salary range of

$95,000 to $98,000 that was closer to Ms. Gentile's current salary, yet she did not reach out to the hiring authority on Ms. Gentile's behalf for that position.

151.    On 3/29/2019, Ms. Gentile stated to K. Reed, J. Strecker, and J. Stocking that she was no longer qualified for software development.

152.    CVMBS encouraged Ms. Gentile to apply for software development positions outside of their College to avoid paying salary of an employee who would potentially be absent on FML leave 14 days/month for symptoms of her ADA and FMLA covered disability.

153.    CVMBS encouraged Ms. Gentile to apply for software development positions outside of their College because they did not have the confidence in her abilities to continue to perform the essential job functions of a Project Management position due to her disability.

154.    CSU attempted to demote Ms. Gentile by encouraging her to apply for software developers positions on more than one occasion.

155.    CSU notified Ms. Gentile of intent to terminate her employment approximately 5 weeks after she told J. Strecker that she might have to take extended leave for symptoms of her ADA covered disability conditions.

156.    CSU notified Ms. Gentile of their intent to terminate her employment approximately 6 weeks after she spoke with Jackie Swaro to ask questions about extended leave and short-term disability processes.

157.    CSU is self-insured and bears the cost of short-term disability insurance pay to Administrative Professional Employees.

158.    CSU believed that Ms. Gentile might soon apply for revised FMLA leave to cover an extended leave for medical conditions related to her ADA disability.

159.    By terminating Ms. Gentile before she sought an FMLA Designation for a longer contiguous absence than her current FMLA Designation, CSU would avoid having to provide Ms. Gentile with such FMLA leave.

160.    By terminating Ms. Gentile before she sought an FMLA Designation for a longer contiguous absence, CSU would avoid having to pay short-term disability income to Ms. Gentile.

161.    CSU terminated Ms. Gentile's employment on 10/11/2019.

162.    As a result of Ms. Gentile's protected activity, CSU terminated Ms. Gentile's employment.

163.    CSU's conduct described herein violated the antidiscrimination laws of the United States and constitutes prohibited discriminatory practices thereunder.

164.    Defendant's conduct and actions described herein was intentional, willful and/or done with malice and/or reckless disregard of Ms. Gentile's protected rights under federal law.

165.    As a direct result of CSU's actions, Ms. Gentile has suffered significant injuries, damages, and losses to be determined at trial.

# D. Statement of Claims
## Claim Three: ADA Discrimination, continued

166.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully

set forth herein.

167.    Ms. Gentile's depression and anxiety were qualifying disability under the ADA.

168.    Ms. Gentile was qualified for her job.

169.    Ms. Gentile successfully performed the essential functions of her job at CSU with

reasonable accommodation.

170.    Ms. Gentile requested FMLA medical leave to accommodate symptoms of her

ADA covered disability.

171.    Ms. Gentile received an FMLA Designation Notice approving unscheduled

medical leave for symptoms related to her ADA disability for estimated frequency of flare-ups

of 1 time per month, up to 14 days per episode, for up to 480 hours for the year.

172.    Ms.Gentile's FMLA Designation was episodic in nature and she was authorized

to return to work between periods of flare-ups.

173.    On 06/18/2019, Supervisor met with Plaintiff and he referred to her disability as

being 'warped'. He said to "recognize the basis on which you make decisions is warped...You

need to keep challenging that warp because it's the warp that's fucking things up. Your true

capacity is not able to come through. Because, you know, your depression, I guess, to put a

word on it. I said warped, but depression… This depression affects your decisions. And some

of those decisions you're making are not the best decisions."

174.    CSU discriminated against Ms. Gentile based on her disability and protected activity, perceived disability, and record of impairment, by terminating her employment.

175.    CSU discriminated against Ms. Gentile based on her disability, perceived disability, and record of impairment, by attempting to place her in a demoted position.

176.    CSU discriminated against Ms. Gentile based on disability and protected activity, by attempting to place her in a demoted position.

177.    Defendant discriminated against Ms. Gentile based on disability and protected activity, by attempting to move her into a different College.

178.    Ms. Gentile's disability was a motivating factor in CSU's decision to terminate her employment.

179.    CSU's conduct described herein violated the antidiscrimination laws of the United States and constitutes prohibited discriminatory practices thereunder.

180.    Defendant's conduct and actions described herein was intentional, willful and/or done with malice and/or reckless disregard of Ms. Gentile's protected rights under federal law.

181.    As a direct result of CSU's actions, Ms. Gentile has suffered significant injuries, damages, and losses to be determined at trial.

# D. Statement of Claims
Claim Four: FML Retaliation, continued

182.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

183.    The FMLA prohibits an employer from discriminating or retaliating against an employee for having exercised or attempting to exercise FMLA rights.

184.    To prove retaliation, a plaintiff must prove that: (1) she engaged in a protected activity; (2) the employer took an action that a reasonable employee would have found materially adverse; (3) there is a causal connection between the protected activity and the adverse action.

185.    Ms. Gentile engaged in protected activity under the FMLA including but not limited to notifying Defendant of her serious medical condition; notifying Defendant of her need for time off work; notifying Defendant of her intent to take FMLA leave; and notifying Defendant of her intent to return.

186.    Ms. Gentile's FMLA Designation was episodic in nature and she was authorized and had intent to return to work between periods of medical flare-ups.

187.    As a result of Ms. Gentile's protected activity, CSU attempted to place her in a demoted job position as a software developer.

188.    A reasonable employee would find CSU's attempt to demote Ms. Gentile into a software development position to be materially adverse

189.    As a result of Ms. Gentile's protected activity, Defendant attempted to move her into a different College.

190.    Ms. Gentile worked in the College of CVMBS for over 19 years.

191.    A reasonable employee would find CSU's attempt to move Ms. Gentile into a different College to be materially adverse.

192.    As a result of Ms. Gentile's protected activity, CSU terminated Ms. Gentile's employment.

193.    A reasonable employee would find CSU's termination of Ms. Gentile to be materially adverse.

194.    In May 2019, Ms. Gentile filed an informal complaint against CSU via CSU OEO's process.

    a.   J. Mayhew was responsible for both OEO duties and complaints against CSU.

    b.   Ms. Gentile asked Ms. Mayhew if there would be a conflict of interest.

    c.   Ms. Mayhew said it would not be a conflict of interest.

    d.   Ms. Mayhew said that the 'HR Solutions' department at CSU typically deals with FML so she would ask her supervisor, Diana Prieto, whether OEO or HR should handle the informal complaint given that both disability and FML were involved.

195.    On 6/5/2019, Ms. Mayhew met with Ms. Gentile and talked about processes surrounding the informal complaint.

    a.   Ms. Mayhew said she spoke with her supervisor, Diana Prieto about whether to have CSU HR or CSU OEO handle the informal complaint.

    b.   Ms. Mayhew said she spoke with Diana and it was decided that J. Mayhew would handle the complaint rather than CSU HR Solutions.

    c.   Ms. Mayhew said she was familiar with FML.

196.    Ms. Gentile included a remark about Ms. Mayhew in her informal complaint to CSU: "…I also mentioned to my supervisor that even OEO had the opinion that I should not tell my Project Team about my disability because it could sound like an excuse for my behavior."

        a.    Upon reading the informal complaint, Ms. Mayhew emailed Ms. Gentile on 5/16/2019, saying, "This statement is inaccurate, and OEO must correct the record."

        b.    Ms. Gentile responded via email to Ms. Mayhew on 5/16/2019, saying, "I will not respond to the accuracy of our conversation at this time, as my limited understanding of the informal process suggests it is not relevant at this stage. However, my statement as written is accurate - this is the information I told my supervisor. I believe that me sharing such information with him is relevant to my complaint. "

        c.    Ms. Mayhew demonstrated a conflict of interest in her email response of 5/16/19.

197.    Defendant's actions were related to Ms. Gentile's exercise or attempted exercise of her FMLA rights.

198.    Defendant's conduct sand actions described herein was intentional, willful and/or done with malice and/or reckless disregard of Ms. Gentile's protected rights under federal law.

199.    As a direct result of CSU's actions, Ms. Gentile has suffered significant injuries, damages, and losses to be determined at trial.

# D. Statement of Claims
Claim Five: FML Interference, continued

200.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

201.    At the time of her request for medical leave, Ms. Gentile was an eligible employee under the Family and Medical Leave Act.

202.    At the time of her request for medical leave, Ms. Gentile had been employed by CSU for over 19 years and had been employed by CSU for at least 1,250 hours during the preceding 12 months.

203.    At the time of Ms. Gentile's request for medical leave, CSU was a covered employer under the Family and Medical Leave Act.

204.    At the time of Ms. Gentile's request for medical leave, CSU had employed 500 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year.

205.    Ms. Gentile was entitled to take up to 12 weeks of FMLA leave because her major depression and anxiety were serious medical conditions that interfered with her cognition and made her unable to perform her job duties.

206.    Under the FMLA, it is unlawful for an employer to interfere with an employee exercising or attempting to exercise any right provided under the Act.

207.    Upon the onset of her medical conditions, Ms. Gentile gave appropriate notice to Defendant of her need to be absent from work episodically.

208.    Defendant was reasonably apprised of Ms. Gentile's request to take time

off work for a serious medical condition.

209.    Defendant interfered with Ms. Gentile's rights under the FMLA by attempting to discourage Ms. Gentile from taking leave by encouraging her to move her into a different job in a different College, where she would then be put in a position of asking a new supervisor for leave of  up to 14 days/month in a job that she had just begun.

210.    Defendant interfered with Ms. Gentile's rights under the FMLA by planning to terminate Ms. Gentile's employment.

211.    Defendant interfered with Ms. Gentile's rights under the FMLA by terminating Ms. Gentile's employment.

212.    Defendant's actions were related to Ms. Gentile's exercise or attempted exercise of her FMLA rights.

213.    Defendant's conduct and actions described herein was intentional, willful and/or done with malice and/or reckless disregard of Ms. Gentile's protected rights under federal law.

214.    As a direct result of CSU's actions, Ms. Gentile has suffered significant injuries, damages, and losses to be determined at trial.